458 So.2d 1284 (1984)
STATE of Louisiana
v.
Isaac KNAPPER.
No. 82-KA-2713.
Supreme Court of Louisiana.
November 26, 1984.
Dissenting Opinion December 5, 1984.
*1285 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., William R. Campbell, Jr., David R. Paddison, Donald L. Foret, Asst. Dist. Attys., for plaintiff-appellee.
Robert Glass, Glass & Reed, New Orleans, for defendant-appellant.
LEMMON, Justice.
This is an appeal from a conviction of first degree murder and a sentence of life imprisonment. The principal issue concerns the admissibility of testimony that a crucial state witness made a statement soon after the crime which was consistent with a portion of his trial testimony. A second issue involves the admissibility of a statement by defendant after the crime.
Facts
Two history professors, John Hakola and Dr. Ronald Banks, were attending a meeting in New Orleans. As they approached the entrance to their hotel near the Superdome at about 9:00 p.m., two young men approached on either side of them and demanded money. The man nearest to Dr. Banks was holding a chrome-plated revolver. Dr. Banks reacted with the statement, "You've got to be kidding". Hakola then struck out at the unarmed robber, who was nearest to him, and burst through the hotel entrance. As he did, he heard a shot and turned to see Dr. Banks lying on the sidewalk, while the two assailants then fled into the night. Dr. Banks had been shot once in the head and was killed instantly.
Hakola described the gunman as 5 feet 9 inches tall and weighing 165 pounds, wearing a dark shirt, dark pants, a grayish-white sailor hat pulled down to his eyes, and a dark bandanna covering his face.
Shortly after the murder, the police, for reasons not revealed in the record, searched for and eventually arrested defendant and Leroy Williams. Both were indicted for first degree murder. Williams eventually entered into an agreement with the prosecutor to plead guilty to manslaughter and to testify against defendant.
At the trial, Hakola testified that defendant was the same height and had the same physical build as the gunman, but he was unable to make a positive identification of defendant as the murderer. Accordingly, Williams' testimony formed the principal basis of the state's case.
Williams testified that he met defendant on the evening of the murder in a New Orleans project, only a few blocks from the hotel where the crime occurred. According to Williams, defendant approached him and asked if he wanted to "make some money". Williams stated that defendant was wearing blue jeans, a black shirt, and a bandanna, which he pulled up onto his face as they approached two men walking to the hotel. He further stated that defendant stepped in front of them, drew a chrome-plated pistol and demanded money. When one of the two men responded, "You've got to be kidding", defendant shot him, and the robbers ran in different directions.
The defense presented the testimony of defendant and several of his relatives. All testified that defendant was at his mother's home in the project at the time of the robbery. Defendant also called a prison inmate named Gordon who testified that he overheard Williams tell a fellow inmate that Williams' mother made him (Williams) "lie on Isaac [defendant] in order for him to get his [Williams'] freedom".
The arguments of counsel focused on Williams' credibility, and the prosecutor acknowledged that his case against defendant rested primarily on Williams' testimony. The jurors, who heard the conflicting *1286 versions presented by defendant and Williams, obviously believed Williams and found defendant guilty as charged. After the jury was unable to reach unanimity on a penalty recommendation, defendant was sentenced to life imprisonment without parole.
Prior Consistent Statement
Defendant argues that the trial court committed reversible error when he permitted Williams' mother to testify during the state's case-in-chief that Williams told her that he was with defendant on the evening of the murder.
After Williams related his version of the incident at trial, the prosecutor asked if he had ever told the story to anyone else, and Williams replied that he told his mother before his arrest that he was with defendant. He added that he knew the police were looking for him and that he did not shoot the victim.
The prosecutor then called Williams' mother and asked her about conversations with her son about the crime prior to his arrest. Mrs. Williams testified, over defense objection, that he told her, after they had learned of defendant's arrest, that he was with defendant and had gone to a wrestling match at the Superdome that night, but he did not tell her what had happened. The trial court sustained defense objections to the prosecutor's questions probing for more details. However, the evidence of the statement by Williams that he and defendant were together near the Superdome on that fateful night was at least in part consistent (omitting other details) with Williams' trial testimony. Thus, the testimony of Mrs. Williams had some bearing on the critical issue of whether defendant was at home with relatives listening to records on the evening of April 12, as he claimed, or whether he was on the streets near the Superdome with Williams looking for a robbery victim, as Williams claimed.
Defendant argues that La.R.S. 15:496 and 497 limit admissibility of prior consistent statements to situations in which the witness' testimony has been "assailed as to a particular fact" and in which the alleged prior statement was made at "an unsuspicious time".
Reviewing the entire record of the trial, we conclude that the trial court did not commit reversible error in overruling defendant's objection (which failed to state the ground on which it was based).[1]
At the time Mrs. Williams testified, her son's testimony arguably had not yet been assailed on the fact of defendant's presence at the scene, but it was nevertheless evident by that point in the proceedings that Williams' testimony was clearly being "assailed" insofar as he implicated defendant as a co-actor and "triggerman" in the robbery-murder. During cross-examination, defense counsel vigorously attacked Williams' credibility, suggesting by his questions that Williams pleaded guilty to manslaughter to save himself from the electric chair.[2]
*1287 La.R.S. 15:496 permits corroboration (by prior consistent statements) only after impeachment, because corroboration prior to impeachment is usually unnecessary. Nevertheless, the witness in this case had been impeached during cross-examination on the basis of bias and interest as an accomplice who was awaiting sentence after a guilty plea. See 4 Wigmore, Evidence § 1128 (Chadbourn rev. 1972). Moreover, if defense counsel's objection had set forth the grounds as required by La.C.Cr.P. Art. 841, then the trial court could have chosen to require the state to hold Mrs. Williams' testimony until the state's rebuttal. Since the trial court was not given the basis for the objection, there was no opportunity to correct the problem by using this option.[3] See State v. Quincy, 363 So.2d 647 (La. 1978).
As to the "unsuspicious time" argument, Williams' conversation with his mother occurred two days before his arrest and several weeks after the crime. Williams' mother knew that defendant had been arrested and that the police were looking for her son. Defense counsel therefore argues that the timing of the statement was suspicious and that the statement lacked reliability in that the statement could be explained as an attempt by Williams to mollify his mother.
While the timing of the statement was not completely unsuspicious, the statement was made long before any plea bargaining began. More importantly, the statement was made before suggestions by other persons had intervened. At the time of the statement, there was no reason for Williams to name defendant as his companion unless the two were together that evening, and to that extent the statement does not lack reliability. Moreover, the importance of the statement to this case was not to show Williams' lack of complicity for the crime, but rather was to show defendant's presence with Williams at the time of the robbery attempt at the hotel near the Superdome. As to that point, the statement had much indicia of reliability because Williams implicated himself as a participant in the incident for which defendant had been arrested, and that declaration against his own interest enhanced the reliability of the statement.
Defendant principally attacks the use of the prior statement for the purpose of corroborating the inherently suspicious testimony of an accomplice. La.R.S. 15:496 does not limit its use to the corroboration of witnesses who are not accomplices. The statutory basis for permitting corroboration by a prior consistent statement made at an unsuspicious time is the probable reliability of the statement.[4] That basis for admissibility is no less valid for a witness who was an accomplice than for any other witness (especially when the statement has inculpatory overtones). We therefore decline to exclude otherwise admissible evidence of Williams' prior consistent statement simply because of Williams' status as an accomplice.
*1288 Statement by Defendant
Defendant alleges that the trial judge erred in allowing Williams to testify as to statements made by defendant after the crime.
During his examination of Williams, the prosecutor asked the witness whether he had ever discussed the evening's activities with defendant.
"Q. Did you ever discuss what happened that evening, with Isaac Knapper?
"A. Yes.
"Q. What was the general gest [sic] of that discussion, Leroy?
"A. He told me not to tell anybody.
"MR. ZIBILICH: Objection, Your Honor.
"THE COURT: Overruled.
"MR. ZIBILICH: Assignment of errors, please.
"EXAMINATION OF MR. PADDISON CONTINUES:
"Q. Would you go ahead and tell the ladies and gentlemen?"
"A. Told me not to tell them nothing about it.
"Q. Excuse me?
"A. Don't tell them nothing about it.
"Q. When was that conversation?
"A. Same night.
"Q. Where was it?
"A. In the Melpomene Project.
"Q. Was it in anybody's house?
"A. No.
"Q. Was anyone else present?
"A. No."
Defendant argues that the state failed to serve the required notice that it intended to introduce this statement. However, counsel did not state the grounds for his objection, and the issue has not been preserved for appellate review. See State v. Quincy, above.
Furthermore, the purpose of the notice required by La.C.Cr.P. Art. 768 is to prevent surprise and allow adequate time for preparation of the defense. State v. Parker, 436 So.2d 495 (La.1983). Defendant does not suggest how his defense would have been different had he been apprised that the state intended to introduce this statement against him. More significantly, this testimony about the later statement pales in significance when considered in light of Williams' other testimony. The crucial issue in the trial was Williams' credibility.
The conviction and sentence are affirmed.
CALOGERO, J., dissents and will assign reasons.
CALOGERO, Justice, dissenting.
I find merit in the defendant's assignment of error regarding the state's use of a co-defendant's prior consistent statement.
La.R.S. 15:496 provides:
When the testimony of a witness has been assailed as to a particular fact stated by him, similar prior statements, made at an unsuspicious time, may be received to corroborate his testimony.
Four conditions must be satisfied before this statute will allow the use of corroborative hearsay to bolster the witness:
(1) the hearsay statement which is offered must be a statement "similar" to the testimony of the witness on the particular fact;
(2) the hearsay statement must be made at an unsuspicious time;
(3) as to the fact in question, the testimony of the witness must be actually "assailed;"
(4) the assault on the witness must be directed at a "particular fact," not at a general fact of the case.
In this case, after the accomplice, Williams, had related his version of the incident, his mother was allowed to testify to their conversation two days before his arrest and shortly after the defendant's arrest. The state's theory of admissibility fails on several if not all of the conditions required by La.R.S. 15:496.
With regard to the first condition, Williams' testimony (he and defendant met in the project at 8:30 P.M. and walked directly to the Hyatt Regency where they committed the crime), and his mother's recitation *1289 of Williams' earlier statement to her (that he and defendant attended a wrestling match at the Superdome adjacent to the Hyatt, with no mention of a robbery or killing) were not really similar, although the majority's treatment of this issue is not entirely implausible.
With respect to the second condition, it can hardly be argued that the prior statement was "made at an unsuspicious time." In fact, the timing of the statement made it inherently suspect. According to the trial transcript, the statement was made a full month after the crime occurred, at a time when Williams knew that the defendant had been arrested and that the police were looking for him. The trial transcript further indicates that Mrs. Williams was also aware that the police were looking for her son and that she had considered the possibility of getting him out of town. Under these circumstances, the mother questioned her son about his whereabouts on the evening of the crime, and this seventeen year old's response was surely motivated by an attempt to minimize his own involvement and to allay her worst fears.
It is also clear that Williams' testimony on the particular issue was never "assailed" within the meaning of the statute. The use of the word "assail" rather than contradict incorporates the idea of an attack. The record reveals no defense attack on Williams' direct testimony that he was with defendant at the killing, nor was he challenged as to his assertion that he told his mother about his story. Instead, the defense made a general credibility attack on Williams, and placed contradictory proof of the defendant's whereabouts and of the identity of the second perpetrator before the jury. And, according to State v. Marcal, 388 So.2d 656, 660 (La.1980), R.S. 15:496 does not authorize the introduction of prior consistent statements to buttress general credibility, where an attack by cross-examination on specific facts asserted by the state witness has not been made. Such "particular facts" must be more narrow than whether or not the defendant was at the scene of the crime and whether he did it, or else every denial of guilt would assail that allegation in a general sense.
In a case such as the present, where defendant strongly protests his innocence, and considering that defendant's conviction hinged so strongly on the testimony of Williams, I cannot say that this trial error in permitting Williams' testimony to be bolstered by an ostensible prior consistent statement constituted harmless error.
For these reasons I dissent.
NOTES
[1] Appellate counsel did not represent defendant at the trial. Thus, the procedural default is certainly not attributable to him. Nevertheless, trial counsel did an admirable job of marshaling a significant volume of evidence which undercut the credibility of Williams, which indicated that defendant did not fit the appearance of the fleeing gunman, and which provided an alibi defense. However, the prosecutor effectively cross-examined those defense witnesses. The whole case thus rose or fell on the believability of Williams' brief but certain testimony naming defendant as his gunman accomplice and describing him as the "prime mover". The jurors also observed defendant on the stand, and they performed their function of determining credibility after a very fair and well conducted trial.
[2] Defense counsel also asked Williams if he ever made any statement concerning the case to or in the presence of Donald Gordon. After Williams denied making any such statement, the prosecutor, obviously aware of Gordon's story (and aware that Gordon would later be called), questioned Williams on redirect about whether he ever told a fellow inmate that he was simply testifying to "get out of trouble". Williams denied ever making such a statement. At this point, the stage was clearly set for Gordon's subsequent testimony concerning the alleged statement by Williams to the effect that his mother was forcing him to lie by implicating defendant to save himself.
[3] The purpose of the contemporaneous objection rule requiring an objection and a statement of grounds is to permit trial courts to avoid error so that trials will be concluded in as error-free manner as possible. In State v. Thomas, 427 So.2d 428 (La.1983), this court said:

"The contemporaneous objection rule has two purposes: (1) to put the trial judge on notice of the alleged irregularity so that he may cure the problem, and (2) to prevent a defendant from gambling for a favorable verdict and then resorting to appeal an error that might easily have been corrected by objection". 427 So.2d at 433.
This principle is particularly relevant when, as here, the question presented really depends on whether the evidence was admissible at the point at which the evidence was admittedand not on whether the evidence should not have been admitted under any circumstances.
[4] Because both the declarant and the witness who testified to the statement are available for cross-examination, a witness' testimony about the prior consistent statement of another witness is not subject to the objections of other hearsay evidence. See Fed.R.Evid. 801(d)(1)(B), which authorizes admission of a prior statement by a witness who testifies at the hearing subject to cross-examination, when the statement is offered to rebut an express or implied charge against the witness of improper influence or motive.